# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

|  |  |  |
|---|---|---|
| RAMONA DENISE WILHOITE, individually and on behalf of other similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:10-CV-03026-NKL |
| v. | ) ) | |
| MISSOURI DEPARTMENT OF SOCIAL SERVICES, by and through its director, Robert J. Levy, et al., | ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Before the Court are the Motion for Summary Judgment [Doc. # 78] filed by Defendants Missouri Department of Social Services ("DSS"), Ronald J. Levy, Ian McCaslin, Julie Creach, and Markus Cicka, the Motion Objecting to Defendants' Fee Statement [Doc. # 86] filed by Plaintiff Ramona Wilhoite ("Wilhoite"), and the Motion to Intervene [Doc. # 80] filed by Wilhoite's counsel on behalf of René Dampier, Justin Epperson, Kelly Forest, Kensey Esry, K.E. by and through her next friend Kensey Esry, Shadow Dickerson, Kathleen Mitchell, Donna Collinge, Sandy Stidham, and Kathryne Harris. For the following reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment, grants Plaintiff's Motion Objecting to Defendants' Fee Statement, and grants the Motion to Intervene.

## I.     Background

### A.     Uncontroverted Facts[1]

On May 14, 2009, Wilhoite submitted an application for MO HealthNet ("Medicaid") benefits to the Dallas County office of DSS.  DSS approved Wilhoite's application for benefits and paid medical expenses on her behalf.

On August 27, 2009, Wilhoite filed a civil suit in Dallas County, Missouri, against the Sheriff and other Sheriff's Department employees.  That underlying suit alleged violations of her civil rights during her incarceration at the Dallas County Jail.  On September 11, 2009, the Dallas County civil suit was removed to the U.S. District Court for the Western District of Missouri.  On December 22, 2009, Wilhoite filed a motion to amend her complaint, which was granted by U.S. District Judge Richard E. Dorr.  In that amended complaint, Wilhoite alleged that during her 51-day incarceration she was served a diet devoid of vitamins and minerals which "cause[d] her to suffer internal bleeding and/or ulcers" and that she "started passing black stool and bloody stool" while confined in the Dallas County Jail.  [Case No. 6:09-cv-03339-RED, Doc. # 17, Ex. 1, ¶¶ 8-10, 29-31.]  Among other counts, Wilhoite's second amended complaint asserted a claim under 42 U.S.C. § 1983 for failure to treat her serious medical condition: "As a direct and proximate result of [those defendants'] . . .

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence.  In considering each party's motion, the Court has drawn all inferences in favor of the non-movant.

failure to provide Plaintiff Wilhoite the necessary medical treatment, Plaintiff Wilhoite suffered damages." *Id.* at ¶ 35.

On January 7, 2010, Wilhoite's attorney, Craig Heidemann, or someone from the firm of Douglas Haun & Heidemann, telephoned DSS requesting a "lien letter." A "lien letter" is a letter sent by DSS to MO HealthNet participants and to liable third parties, alerting them to the debt owed to the Department and to the Department's right to a lien under Missouri's Medicaid lien statute, Section 208.215.

The same day, January 7, DSS sent a lien letter to Wilhoite's attorneys. The letter's subject line identified May 13, 2009, as the date of Wilhoite's injury and gave notice that DSS was "asserting a lien against any settlement or judgement involving" Wilhoite, in the "Total Lien Amount" of $4,411.29. [Doc. # 79, Ex. C at 6.] The letter explained:

> Section 208.215, RSMo (Cum. Supp. 2007) grants the Department a lien upon any funds to be paid as a result of any settlement or judgement obtained or made by the above-named MO HealthNet participant. This letter, therefore, is your notice that the Missouri Department of Social Services is asserting a lien against any settlement or judgement involving the above-named MO HealthNet participant.
>
> The amount paid, <u>as of this date</u>, is $4,411.29. This amount is subject to change. . . . **Please contact the MO HealthNet Division before any settlement is offered and we will advise you if additional payments have been made**. If a settlement has already been reached you may dispose of our lien directly by issuing a check made payable to the MO HealthNet Division.

*Id.* DSS attached a detailed billing statement to the letter.

On January 14, 2010, Wilhoite's attorneys telephoned DSS asking for the removal from the billing statement of all payments for mental health services. DSS technician Rachel

Schmitz noted at that time: "Attorney's office called. Says psychological issues are not related to this case." *Id.* at 12. Schmitz's affidavit explains: "Based upon my research in response to that call, I was able to confirm that the payments in question were to treat a psychological condition of Ms. Wilhoite's that pre-existed her May 13, 2009, injury." *Id.* at 2. The next day, January 15, DSS sent a revised letter to Wilhoite's attorneys, which included an updated billing statement and a request to be notified prior to the satisfaction of any judgment, award, or settlement of Wilhoite's claim against the third party liable to her for the injury that occurred on May 13, 2009.

On January 21, 2010, the Department sent a letter to Wilhoite's attorneys seeking an update on the status of Wilhoite's pending claim against the third party liable to her for the May 13, 2009 injury. The "LIEN AMOUNT" was stated as $4,021.44. *Id.* at 20.

Also on January 21, 2010, Wilhoite filed this action against Missouri DSS. On February 2, 2010, Wilhoite's attorneys received a check for $20,000, payable to Denise Wilhoite and Douglas Haun & Heidemann, issued by the insurer of the Dallas County Sheriff's Department. During discovery, Wilhoite stated that she settled her claims against the Dallas County Sheriff's Department "for violation of my civil rights," but the settlement "did not include reimbursement for medical expenses." [Doc. # 50, Ex. G at 1-2.] Nonetheless, in response to the DSS letters asserting a lien against any settlement of her case, Wilhoite deposited an amount equal to the Medicaid expenditures in her attorney's trust account, where it remains today.

## B.    Procedural History

Wilhoite's original Complaint alleged: "Despite Plaintiff's and class members' receiving recovery for damages in addition to reimbursement for medical expenses, Defendant has attached liens and received recovery payments out of Plaintiff's and class members' gross settlements/judgments."  [Doc. # 1, ¶ 27.]  Wilhoite alleged that such a practice violated federal law because Defendant "asserted liens and received recovery where medical costs were only a portion of Plaintiffs and class members' recovery."  *Id.* at ¶ 31.

Thus, Wilhoite alleged violations of Section 1396p(a)(1) of the Social Security subchapter on "Grants to States for Medical Assistance Programs," which provides: "No lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan . . . ." 42 U.S.C. § 1396p(a)(1) ("Federal Anti-Lien Statute").  In *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268, 292 (2006), the U.S. Supreme Court held that this Federal Anti-Lien Statute precluded a state from asserting a lien on settlement or judgment proceeds for damages other than medical costs.

Wilhoite's original Complaint asserted three counts against DSS.  Count I was brought under 42 U.S.C. § 1983, alleging a violation of the Federal Anti-Lien Statute as well as the Fifth and Fourteenth Amendments.  Count I prayed for injunctive relief, damages, and fees.  Count II asserted an unjust enrichment claim, alleging that a benefit was conferred on Defendant, retention of which would be inequitable.  Count II prayed for disgorgement of

all amounts collected in violation of the Federal Anti-Lien Statute, as well as injunctive relief. Count III asserted a breach of contract claim and prayed for damages.

On February 4, 2011, DSS filed its first motion for summary judgment [Doc. # 49]. On February 7, 2011, the Court granted Wilhoite's motion to certify the following class:

> Missouri citizens who have received Medicaid and who had liens asserted and/or monies taken by Defendant out of their third party civil settlements or judgments from January 21, 2000 to present, where said settlements or judgments were unrelated to medical care and services, or where the liens asserted and or monies taken by the Defendants were in excess of the amount of said settlement or judgment related to medical care and services, in violation of 42 U.S.C. § 1396p(a)(1).

[Doc. # 51.]

At a March 3, 2011 teleconference, the Court extended discovery and granted Wilhoite leave to file her first motion to amend her Complaint. Wilhoite's First Amended Complaint sought to join the following Defendants, in their individual capacities: Ronald J. Levy, Julie Creach, Ian McCaslin, Deborah E. Scott, Chris Reeter, Steven Renne, K. Gary Sherman, Christine Rackers, Q. Michael Ditmore, Michael Rehagen, Judy Muck, David Hart, Markus Cicka, and John and Jane Does 1-10. Between 2000 and the present, these individuals were directors of DSS, the Third Party Liability Unit, the MO HealthNet Division, or Missouri Medicaid. Wilhoite's Motion to Join Additional Parties (Doc. # 58) was granted by the Court on April 26, 2011.

Wilhoite stated that her First Amended Complaint also sought to clarify her claims and Wilhoite made the following factual allegations. First, because of the liens Defendants

asserted pursuant to Mo. Rev. Stat. § 208.215.8, Defendants received payments out of class members' settlement proceeds and judgments in excess of the amounts authorized by federal law. Wilhoite acknowledges that she has maintained the amount of Defendants' lien in her attorney's trust account to satisfy Defendants' lien. Second, Defendants wrongfully asserted liens and received recovery where medical costs were only a portion of class members' recovery. With respect to Wilhoite, Defendants wrongfully asserted a lien on her settlement, which did not include any compensation for medical costs.

The First Amended Complaint contains seven counts. Count I asserts a Section 1983 claim against Defendants Levy, Creach, McCaslin, Scott, Reeter, and Does, in their individual capacities, alleging violations of the Federal Anti-Lien Statute as well as the Fifth and Fourteenth Amendments. Count I prays for damages and fees. Count II asserts a similar Section 1983 claim against all Defendants, but prays for injunctive relief as well as fees. Count III is a separate claim for fees under 42 U.S.C. § 1988 against all Defendants. Count IV is asserted against all Defendants under 28 U.S.C. § 2201 and seeks a declaration that (1) Mo. Rev. Stat. § 208.215.8 violates the U.S. Constitution; (2) Mo. Rev. Stat. § 208.215.8 violates the Federal Anti-Lien Statute; (3) Defendants' lien procedures violate the U.S. Constitution; and (4) Defendants' lien procedures violate the Federal Anti-Lien Statute. Count V separately asserts a Takings Clause violation against all Defendants, praying for just compensation. Count VI asserts an unjust enrichment claim against all Defendants, praying for disgorgement of all amounts collected in violation of the Federal Anti-Lien Statute.

Finally, Count VII asserts a breach of contract claim against Defendant Levy in his official capacity, alleging that DSS breached a contract with Plaintiff and class members by violating the Federal Anti-Lien Statute, and praying for damages.

On April 26, 2011, besides granting Wilhoite's motion to amend her Complaint, the Court also denied as moot Defendant's first motion for summary judgment, and ordered Plaintiff to pay reasonable attorneys fees for Defendant's briefing of that motion for summary judgment. In granting Plaintiff's motion to amend, the Court found that (1) Plaintiff's claims against the individual Defendants for damages were not barred by the Eleventh Amendment; and (2) Plaintiff demonstrated good cause to amend. [Doc. # 73.]

At a May 2, 2011 teleconference:

> The Court indicated that the issue of whether a lien arose in the case of Plaintiff Wilhoite remained unresolved following Plaintiff's filing of her First Amended Complaint. Plaintiff's counsel responded that he would like to file a Second Amended Complaint adding an additional named plaintiff. Counsel for Defendant Missouri DSS stated that he would file a dispositive motion to challenge Plaintiff Wilhoite's claims. The Court gave the parties 14 days to file their motions.

[Doc. # 76.] Plaintiff's counsel filed a Motion to Intervene on May 16, attaching a proposed Intervenors' Complaint [Doc. # 80, Ex. 1], which is nearly identical to Plaintiff's First Amended Complaint, with the exception of some distinct factual allegations as described below.

## II.      Discussion

### A.      The Motion to Intervene

Rule 24(b), regarding permissive intervention, provides in relevant part:

> On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact.
> . . .
> In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(b)(1), (3).

Here, the putative intervenors allege that they stand in a similar (but not identical) legal position vis-a-vis Defendants:

> 5. Putative intervenors, René Dampier, Justin Epperson, Kelly Forest, Kensey Esry, K.E., Donna Collinge, and Kathryne Harris all paid money to the Missouri Department of Social Services to satisfy liens asserted by Defendants.

> 6. Sandy Stidham is the surviving mother of Chasity Cook (deceased). Before her death, Chasity Cook received Medicaid benefits and paid the Department of Social Services money to satisfy a lien asserted by Defendants in Ms. Cook's personal injury action.

> 7. Like Plaintiff, Shadow Dickerson and Kathleen Mitchell have both maintained portions of their settlements in their lawyers' trust accounts because of the lien claimed by Defendants.

[Doc. # 80, ¶¶ 5-7.] The intervenors also assert that Defendants have asserted liens on their gross settlements and judgments in excess of the compensation they received for past medical costs.

Defendants do not contest that these intervenors have claims that share a common question of law or fact with Wilhoite's claims. However, Defendants argue that the

intervenors' legal arguments do not differ from those already at issue in this case, and therefore their presence would cause undue delay.

A fact central to the legal arguments in this case is whether any lien payment has been made to DSS. For this reason, the Court grants the Motion to Intervene pursuant to Rule 24(b). For the reasons provided by the Court in granting Wilhoite's motion to amend her Complaint, this procedural development will not cause undue prejudice or delay. Unlike in *Trim Fit, LLC v. Dickey*, 607 F.3d 528, 531 (8th Cir. 2010), Wilhoite's counsel has not moved to amend the pleadings on the eve of trial, nor has discovery taken place which would not otherwise have occurred. In fact, when this motion was filed, new Defendants had recently been named and had not yet been served, no depositions had been taken, and discovery on the merits had not begun. Further, the Court has temporarily stayed all discovery.

Finally, even assuming that Rules 15(a) and 16(b) apply to the intervenors, there has been no undue delay or bad faith, as it appears that statements made at the May 2, 2011 teleconference prompted Wilhoite's counsel to file this motion. Given the recent developments in the case, Wilhoite's counsel had good cause for this motion and responded in a reasonable time period.

## B. Wilhoite's Objection to Defendants' Fee Statement

The Court has considered Wilhoite's Objection to Defendants' Fee Statement [Doc. # 86]. When the Court ordered Wilhoite to pay the reasonable cost for Defendants' first

motion for summary judgment, the Court intended to compensate Defendants for duplicative effort caused by Wilhoite amending her Complaint to add individuals defendants. Having compared Defendants' first and second motions for summary judgment, it appears that there is substantial overlap between the motions. Furthermore, the Court is convinced that changes made by Defendants between their first and second motions for summary judgment were not caused by Wilhoite's motion to amend. Therefore, the Court vacates its order in Doc. # 73 requiring Wilhoite to pay Defendants' reasonable attorneys fees for the preparation of their first motion for summary judgment. The Court notes that the work done by Defendants' counsel was well done and the hourly fee requested was reasonable under these circumstances.

### C. Defendants' Motion for Summary Judgment

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

### 1.    The Federal Anti-Lien Statute

With respect to Section 1396p(a)(1), Wilhoite's Count I asserts a Section 1983 claim, seeking damages against the individual Defendants for Federal Anti-Lien Statute violations. Count II asserts a similar Section 1983 claim, but prays for injunctive relief as well as fees. Count IV seeks a declaration that, inter alia, Mo. Rev. Stat. § 208.215.8 violates the Federal Anti-Lien Statute, and Defendants' lien procedures violate the Federal Anti-Lien Statute.

Defendants argue that, as a matter of law: (1) Missouri's lien statute is consistent with the Federal Anti-Lien Statute; and (2) Defendants never imposed a lien on Plaintiff Wilhoite's settlement proceeds.

### a.    Whether the Missouri Lien Statute Violates the Federal Anti-Lien Statute

Missouri's lien statute, Section 208.215, provides, in part:

The department of social services or MO HealthNet division shall have a lien upon any moneys to be paid by any insurance company or similar business enterprise, person, corporation, institution, public agency or private agency in settlement or satisfaction of a judgment on any claim for injuries or disability or disease benefits arising from a health insurance program to which the participant may be entitled which resulted in medical expenses for which the department or MO HealthNet division made payment. . . . In each case, a lien

notice shall be served by certified mail or registered mail, upon the party or parties against whom the applicant or participant has a claim, demand or cause of action. The lien shall claim the charge and describe the interest the department or MO HealthNet division has in the claim, demand or cause of action. The lien shall attach to any verdict or judgment entered and to any money or property which may be recovered on account of such claim, demand, cause of action or suit from and after the time of the service of the notice.

Mo. Rev. Stat. § 208.215.8.

Wilhoite's theory is that under this statute, DSS acquires an automatic lien on any moneys paid in settlement or satisfaction of a judgment on any claim for injuries which resulted in medical expenses being paid by DSS, regardless of whether those monies are compensation for medical expenses. However, Defendants maintain that "to the extent that the lien arises by operation of statute, it only arises under specific factual conditions," namely: (1) there must be a Medicaid debt owed, (2) there must be a cognizable claim against a liable third party, (3) the lien must be timely perfected – i.e., the Department must send a notice to the liable third party before it pays the claim to the Medicaid participant plaintiff – and (4) the claim against the liable third party must result in a judgment or settlement. [Doc. # 79 at 10-11.]

The Missouri lien statute does not include any reference to "perfection" of the lien, but the statute does state that the lien "shall attach to any verdict or judgment entered and to any money or property which may be recovered on account of such claim, demand, cause of action or suit from and after the time of the service of the notice." Mo. Rev. Stat. § 208.215(8). Such a "lien notice shall be served by certified mail or registered mail, upon the

party or parties against whom the applicant or participant has a claim, demand or cause of action." *Id.* Here, the lien notice was never served on the party against whom Wilhoite had a claim; Wilhoite's counsel never provided Defendants with that information.

Defendants argue that the Missouri lien statute does not create an "enforceable" lien in every case in which a Medicaid recipient has a legal claim against a third party. Defendants state:

> There is a vast difference between the statutory right to a lien and the actual power of an enforceable lien. The four requirements listed above must be met in order for an enforceable lien to exist; otherwise, all the Department has is the statutory right to a lien.

[Doc. # 79 at 11.] To support this distinction, Defendants cite the following explanation offered by the Missouri Court of Appeals:

> The applicability of § 208.215 is not dependent upon the Department filing a lien under subsection 8 of the statute. Section 208.215.1 establishes the public policy that Medicaid is the payer of last resort and, when there is a third party liable to a recipient of public assistance on account of personal injury or disability or disease for which the department has paid medical expenses, the statute creates a debt due the state from the third party in the amount of the medical assistance payments made on behalf of the recipient. The statute authorizes the Department of Social Services to collect this state debt by maintaining "appropriate" actions. Section 208.215.2. In addition to authorizing the Department to sue to collect the state debt, the statute creates a lien on the moneys owed by a third party to the recipient of public assistance. The filing of a lien is merely a mechanism that § 208.215 provides the Department to collect the state debt as its portion of any recovery from a liable third party.

> Section 208.215.8 gives the Department the right to file a lien by providing that the Department "*shall have a lien* upon any moneys to be paid by any insurance company or similar business enterprise, person, corporation, institution, public agency or private agency in settlement or satisfaction of a

judgment on any claim for injuries . . . which resulted in medical expenses for which the department made payment." (Emphasis added). Section 208.215.8 does not require the Department to file a lien. Therefore, even though the Department did not file a lien against the Estate's recovery from the third party in this case, § 208.215 still applies because the public assistance benefits paid on account of Mr. Pierce's injury, for which a third party was liable, is a debt due the Department. The Department chose to collect this debt, along with reimbursement for other medical assistance benefits it paid on Mr. Pierce's behalf during his lifetime, by filing a claim under § 473.398. The filing of a claim in a decedent's probate estate is an "appropriate action" as permitted by § 208.215.2.

*Pierce v. Missouri Dep't of Soc. Servs.*, 969 S.W.2d 814, 821 (Mo. Ct. App. 1998).

Defendants also cite *American Family Mutual Insurance Company v. Fehling*, 970 S.W.2d 844 (Mo. Ct. App. 1998). Like *Pierce*, *Fehling* was decided in 1998, following the amendment of Missouri's lien statute. In *Fehling*, the Missouri Court of Appeals interpreted Section 208.215.8's "three new sentences, the first two dealing with a 'lien notice,' which is required (1) to be served on 'the party . . . against whom the applicant has a claim . . . .'; and (2) to 'claim the charge and describe the interest the department has . . . .'" *Fehling,* 970 S.W.2d 844 at 850 (citing Mo. Rev. Stat. § 208.215.8). Those two sentences of Section 208.215.8 provide in full:

In each case, a lien notice shall be served by certified mail or registered mail, upon the party or parties against whom the applicant or participant has a claim, demand or cause of action. The lien shall claim the charge and describe the interest the department or MO HealthNet division has in the claim, demand or cause of action.

Mo. Rev. Stat. § 208.215.8.  A comparison of *Fehling*'s analysis above with the text of the

statute reveals that Missouri courts interpret the term "lien" as synonymous with the "lien

notice" – or what Defendants here call a "lien letter."

*Fehling* also explained:

When the legislature amended Section 208.215 in 1996, it added four new subsections: (9), (10), (11), and (12); all of these amendments related to the procedure by which the "lien" or "charge" would be enforced.

Since [Missouri DSS], after the 1996 amendment, no longer had a right to recover the "full amount," the legislature created a mechanism by which a court "may reduce and apportion the department's lien. . . ." This mechanism is contained in the four new subsections of 208.215:(9), (10), (11), (12).

Section 208.215.9 provides that the court "may adjudicate the rights of the parties and enforce the charge," and "may determine what portion of the recovery shall be paid to the department against the recovery." In making such a determination, "the court shall conduct an evidentiary hearing and shall consider competent evidence" relating to six enumerated issues [including the amount of the charge sought to be enforced as a percentage of the gross amount of the recovery].

Section 208.215.10 RSMo (1996) allows that the "burden of producing evidence sufficient to support the exercise by the court of its discretion to reduce the amount of a proven charge sought to be enforced against the recovery shall rest with the party seeking such reduction."

*Fehling,*  970 S.W.2d at 852.

Therefore, under Missouri law, DSS may assert a lien for the entire amount of the

medical assistance payments, which would then put the burden on the Medicaid recipient to

"produc[e] evidence sufficient to support the exercise by the court of its discretion to reduce

the amount of a proven charge sought to be enforced against the recovery . . . ." Mo. Rev.

Stat. § 208.215.10. *Pierce* also said that under the amended Section 208.215.9, "the Department is not necessarily entitled to recover the full amount of public assistance benefits it paid," because – if the Medicaid recipient carries her burden in challenging the amount asserted in lien – "the court can reduce the Department's portion of the recovery from the liable third party." *Pierce,* 969 S.W.2d at 821-22.

A straightforward application of *Ahlborn* follows from the above interpretations of Missouri's lien statute, as supplied by the Missouri Court of Appeals decisions cited by DSS. 0In *Ahlborn*, the Arkansas Department of Human Services ("ADHS") paid $215,645.30 for the plaintiff's medical treatment and sent her attorney letters providing notification that ADHS had a right to reimbursement from "any settlement, judgment, or award" she obtained. *Ahlborn*, 547 U.S. at 273. The underlying suit settled for $550,000, but the parties made no allocations for specific categories of damages. *Id.* at 274. ADHS then imposed a lien pursuant to the Arkansas lien statute – which provided that the assignment of a Medicaid recipient's right to a settlement, judgment, or award "shall be considered a statutory lien on any settlement, judgment, or award received from a third party." *Ahlborn,* 547 U.S. at 278 (quoting Ark. Code Ann. § 20-77-307(c)).

Justice Stevens explained that

if, for example, a recipient sues alone and settles her entire action against a third-party tortfeasor for $20,000, and ADHS has paid that amount or more to medical providers on her behalf, ADHS gets the whole settlement and the recipient is left with nothing. This is so even when the parties to the settlement allocate damages between medical costs, on the one hand, and other injuries like lost wages, on the other.

17

*Id.* at 278-79. Justice Stevens noted that his interpretation of the Arkansas lien statute had

been confirmed by the Arkansas Supreme Court, which had written:

> By creating an automatic legal assignment which expressly becomes a statutory lien, [Ark. Code Ann. § 20-77-307 (1991)] makes an unequivocal statement that the ADHS's ability to recover Medicaid payments from insurance settlements, if it so chooses, is superior to that of the recipient even when the settlement does not pay all the recipient's medical costs.

*Id.* (quoting *Arkansas Dep't of Human Servs. v. Ferrel*, 984 S.W.2d 807, 811 (1999)).

Here, as in *Ahlborn*, the state courts have explained that the state statute – regardless

of any action taken by the Department – "creates a debt due the state from the third party in

the amount of the medical assistance payments made on behalf of the recipient" and

simultaneously "creates a lien on the moneys owed by a third party to the recipient of public

assistance." *Pierce*, 969 S.W.2d at 821. Whether or not the lien itself becomes enforceable

as a result of discretionary actions taken by the Department regarding proper notice, the

statute provides that "the Department '*shall have a lien* upon any moneys to be paid by any

insurance company or similar business enterprise, person, corporation, institution, public

agency or private agency in settlement or satisfaction of a judgment on any claim for injuries

. . . which resulted in medical expenses for which the department made payment.'" *Id.*

As in *Ahlborn*, DSS "points to no provision of the [Missouri] statute that would

prevent it from" demanding the entirety of the costs it paid on the Medicaid recipient's

behalf. *Ahlborn*, 547 U.S. at 279 n.8. Thus, Defendants' argument that Section 208.215

automatically provides DSS with a "statutory right to a lien" but not "the actual power of an

enforceable lien" misses the mark. [Doc. # 79 at 11.] Because the Arkansas and Missouri statutes are equivalent in all relevant respects, the Supreme Court's conclusion in *Ahlborn* must be applied here: Missouri's "statute finds no support in the federal third-party liability provisions, and in fact squarely conflicts with the anti-lien provision of the federal Medicaid laws." *Id.* at 280. Counter to Defendants' arguments, the Court cannot conclude as a matter of law that Missouri's lien statute is consistent with the Federal Anti-Lien Statute.

> **b.     Whether Defendants' Lien Procedures Violated the Federal Anti-Lien Statute**

Defendants also argue that, as a matter of law, Defendants never imposed a lien on Wilhoite's settlement proceeds. Defendants argue that since there is no "enforceable" lien here, "[t]he Department's statutory right to a lien could not, and did not, create an imposition or encumbrance on Wilhoite's settlement with the Dallas County Defendants, so the Department did not violate the anti-lien statute." [Doc. # 79 at 12.]

Yet *Ahlborn* and the Federal Anti-Lien Statute do not qualify the prohibition on a state's assertion of a lien against judgment or settlement proceeds for non-medical costs by requiring that the asserted lien be enforceable. Indeed, *Ahlborn* held that the Arkansas lien was unenforceable. *Ahlborn*, 547 U.S. at 292. Whereas *Ahlborn* concluded that a state could not legally "assert a lien on [a Medicaid recipient's] settlement in an amount exceeding" the proceeds for medical costs, *id.*, DSS sent notice to Wilhoite that it was "asserting a lien against any settlement or judgement involving" Wilhoite, in the "Total Lien Amount" of $4,411.29 – i.e., the entirety of the costs it paid on her behalf. [Doc. # 79, Ex. C at 6.]

It is also uncontroverted that Wilhoite's settlement did not include reimbursement for medical expenses. While Defendants argue that this fact reveals that it had no enforceable lien against Wilhoite – a claim that finds no clear support in the text of the Missouri lien statute – they do not deny that DSS had a statutory right to a lien against Wilhoite. They also do not deny that DSS "assert[ed] a lien against any settlement or judgement involving" Wilhoite. *Id.* Rather, Defendants argue that "[m]erely sending a letter saying that a lien is being asserted does not rise to the level of imposition prohibited by the anti-lien statute." [Doc. # 79 at 134.]

Defendants' logic is inconsistent with both the holding and the reasoning in *Ahlborn*. As mentioned above, *Ahlborn* explicitly concluded that a state could not legally "assert a lien on [a Medicaid recipient's] settlement in an amount exceeding" the proceeds for medical costs. *Ahlborn*, 547 U.S. at 292. *Ahlborn*'s holding is entirely consistent with the text of the Federal Anti-Lien Statute itself, since the statute provides that no lien may be "imposed" – rather than "enforced" – against the property of any individual prior to her death on account of medical assistance paid on her behalf under the State plan. 42 U.S.C. § 1396p(a)(1). Moreover, *Ahlborn* eschewed formalism in favor of a pragmatic approach, focusing on the "effect" of the state's lien statute:

> The terms that Arkansas employs to describe the mechanism by which it lays claim to the settlement proceeds do not, by themselves, tell us whether the statute violates the anti-lien provision. . . . In effect, and as at least some of the statutory language recognizes, Arkansas has imposed a lien on Ahlborn's property.

*Ahlborn*, 547 U.S. at 286 (citing *United States v. Craft*, 535 U.S. 274, 279 (2002); *Drye v. United States*, 528 U.S. 49, 58-61 (1999)).

Therefore, DSS asserted a lien for an amount greater than Wilhoite's compensation for medical costs – in violation of *Ahlborn*.

### 2.    Wilhoite's Constitutional Claims under Section 1983

Plaintiff's Count I, asserting a Section 1983 claim, also alleges violations of the Fifth and Fourteenth Amendments, seeking damages and fees. Count II asserts a similar Section 1983 claim, but prays for injunctive relief as well as fees. Count IV seeks a declaration that, inter alia, Mo. Rev. Stat. § 208.215.8 violates the U.S. Constitution and Defendants' lien procedures violate the U.S. Constitution. Count V separately asserts a Takings Clause violation against all Defendants, praying for just compensation.

### a.    The Takings Clause

Wilhoite contends that the lien letter produced a "constructive taking." Yet, she cites no authority for such a concept in this context. In the absence of such authority, the Court declines Wilhoite's invitation to expand the already complicated takings jurisprudence.

For these reasons, the Court grants Defendants' Motion for Summary Judgment with respect to Count V.

### b.    Substantive Due Process

The parties agree that the relevant test for a substantive due process claim requires a showing that the actions of the governmental officer were "so egregious, so outrageous, that

it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010). Wilhoite argues that "Defendant's violation of Plaintiff's and class members' rights is conscience shocking because of Defendant's knowledge of the federal anti-lien statute, including the Supreme Court's interpretation of the statute, and refusal to comply with it." [Doc. # 83 at 18.] However, the knowing violation of a federal statute does not per se "shock the conscience" – a label reserved for abhorrent acts. *See*, *e.g.*, *Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001) (police officers coerced a mentally handicapped youth to admit to murder and then coerced another mentally handicapped youth to implicate him in the crime). As stated in *Tristani v. Richman*, 609 F. Supp.2d 423 (W.D. Pa. 2009), under similar circumstances:

> Even assuming *arguendo* bad faith on the part of defendants, the court can not conclude that defendants' conduct shocks the conscience.
>
> To do so would run counter to the principle that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."

*Tristani*, 609 F. Supp.2d at 479 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Wilhoite has failed to cite an analogous case in which a court has determined that such conduct shocked the conscience. Indeed, Wilhoite relies primarily on *Zutz*, in which the Eighth Circuit affirmed summary judgment with respect to the substantive due process claim because "all that the appellants have alleged are assertions of defamatory conduct to which

they attach the label of extreme conduct violating the appellants' fundamental rights." *Zutz*, 601 F.3d at 850.

For these reasons, the Court grants Defendants' Motion for Summary Judgment as it relates to Plaintiff's substantive due process claim.

### c.    Procedural Due Process

Under the Fourteenth Amendment, a state cannot deprive a person of her protected property interests without due process. *Schueller v. Goddard*, 631 F.3d 460, 462 (8th Cir. 2011). "A protected property interest exists where a plaintiff has a 'legitimate claim of entitlement' to a benefit that is derived from a source such as state law." *Id.* at 462-63 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Defendants do not argue that Wilhoite had no legitimate claim of entitlement to a benefit here. Indeed, as *Tristani* explained:

> [T]he entire settlement awards were [plaintiffs'] "property." *Ahlborn*, 547 U.S. at 285. Consequently, [plaintiffs] had constitutionally protected property interests in their settlement awards.

609 F.Supp.2d at 480 (citation omitted).   With respect to whether there was a deprivation of that property interest, *Tristani* continued:

> If they had made payments to satisfy the liens on a voluntary basis, they would have been unable to establish the existence of "deprivations."  The attorneys for [plaintiffs] received written notices that, under Pennsylvania law, anyone who failed to honor the [Department of Public Welfare's] rights . . . could face criminal and civil penalties.  They testified that they took representations made by the DPW at face value, and that the payments made to the DPW were mandatory.  Hence, the court concludes that [plaintiffs] were "deprived" of their property for purposes of the Fourteenth Amendment.

*Id.* (citations omitted).

Here, however, at least with respect to Wilhoite, there was no payment made to satisfy the liens. Rather, Wilhoite placed the amount of the lien in her attorney's trust account, apparently in consideration of Missouri's Section 208.215.4:

> A [Medicaid] participant who has notice or who has actual knowledge of the department's rights to third-party benefits who receives any third-party benefit or proceeds for a covered illness or injury is either required to pay the division within sixty days after receipt of settlement proceeds the full amount of the third-party benefits up to the total MO HealthNet benefits provided or to place the full amount of the third-party benefits in a trust account for the benefit of the division pending judicial or administrative determination of the division's right to third-party benefits.

Mo. Rev. Stat. § 208.215.4. Without having paid the lien – and without having informed DSS that no part of her settlement proceeds were for medical costs – as Judge Posner has stated in another context, any "deprivation was merely a postponement." *Brown v. Brienen*, 722 F.2d 360, 366 (7th Cir. 1983).

Even assuming that Wilhoite was deprived of her property, while the Due Process Clause requires "that in order to deprive a person of a property interest, he must receive notice and an opportunity for a hearing appropriate to the nature of the case," this entails merely "the *opportunity* to be heard and, thus, a party can waive his due process right." *Moore v. Bd. of Educ. of Fulton Sch.*, 836 S.W.2d 943, 947 (Mo. 1992) (en banc). Indeed, "the existence of an adequate state remedy to redress property damages inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." *Bonner v.*

*Coughlin*, 517 F.2d 1311, 1319 (7th Cir. 1975), *modified en banc*, 545 F.2d 565 (1976), *quoted with approval in Parratt v. Taylor*, 451 U.S. 527, 542 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

Here, Wilhoite had both informal and formal avenues to correct the erroneous lien, but opted to file her Section 1983 claims before pursuing such avenues. Given the informal communications between Wilhoite's attorneys and DSS – and in light of Defendant's willingness to adjust the lien amount in accordance with their representations regarding the settlement – Wilhoite has not shown that Defendant's procedures were inadequate to prevent an erroneous deprivation. Even if she had exhausted informal avenues of correcting the error, she could have also availed herself of the procedures afforded by Section 208.215.9 – procedures that Wilhoite has failed to call into question here. Having never revealed to DSS before filing this lawsuit that none of her settlement proceeds were for medical costs, Wilhoite has waived any procedural due process claim.

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment with respect to Wilhoite's procedural due process claims. Because Wilhoite has failed to maintain any of her constitutional claims, the Court grants summary judgment against her with respect to her claims in Counts I, II, IV, and V based solely on the U.S. Constitution.

### 3.    Qualified Immunity and the Eleventh Amendment

The individual Defendants also argue that they are protected by qualified immunity. "Qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were 'nevertheless objectively reasonable in light of the clearly established law at the time of the events in question.'" *Turpin v. County of Rock*, 262 F.3d 779, 783 (8th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). Thus, "[a] state official . . . is protected by qualified immunity from a section 1983 claim 'unless [his] alleged conduct violated clearly established federal constitutional or statutory rights of which a reasonable person in [his] position [ ] would have known." *Mo. Protection & Advocacy Servs. v. Mo. Dep't of Mental Health*, 447 F.3d 1021, 1025 (8th Cir. 2006) (quoting *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005)). A state official is protected by qualified immunity "so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001) (quoting *Anderson*, 483 U.S. at 638). In determining whether a legal right is clearly established, the Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

As this Court has previously held:

Defendants are still protected by qualified immunity against the section 1983 claim for legal damages, at least up to and including February 9, 2005, when the Eighth Circuit decided *Ahlborn v. Arkansas Department of Human Services*. In *Ahlborn*, the Eighth Circuit held, "The Arkansas statutes requiring

26

Ahlborn to assign her entire cause of action against the third-party tortfeasors, and establishing a statutory lien on settlement proceeds for matters other than medical care and services, conflict with and frustrate this federal scheme." 397 F.3d at 628; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (noting threshold inquiry in qualified immunity analysis is whether plaintiff's allegation, if true, establish a constitutional violation). Thus, it has been established that a State may not place a lien on a [plaintiff's] third-party proceeds unrelated to medical care and services.

. . .

However, to the extent that Plaintiffs are simply asking for a return of their allegedly improperly-taken money or an order removing any improper lien against their property, qualified immunity is not available. Basically, Plaintiffs are requesting equitable relief, which is not precluded by qualified immunity. *See Grantham v. Trickey*, 21 F.3d 289, 295-96 (8th Cir. 1994) ("There is no dispute that qualified immunity does not apply to claims for equitable relief . . . and that state officials may be sued in their official capacity for equitable relief." (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989); *Stanley v. Magrath*, 719 F.2d 279, 284 n.9 (8th Cir. 1983))). In discussing qualified immunity and equitable relief, the Eighth Circuit has explained:

> The fact that a remedy may require one party to pay money to another is not a sufficient reason to characterize the remedy as "legal relief." However, because money damages was the traditional form of relief offered in the courts of law, "federal law has consistently held that money damages are generally characterized as a legal remedy." Accordingly, a monetary award will be characterized as equitable only if it possesses one of the two fundamental attributes of an equitable remedy.

> First, a monetary award may be an equitable remedy if the award is "restitutionary" in nature, "such as in actions for disgorgement of improper profits."

*Hopkins v. Saunders*, 199 F.3d 968, 977 (8th Cir. 1999). Here, Plaintiffs clearly want restitution, restoring to them money that was rightfully theirs and putting them in the position they would have been had the statutes been properly followed. *See id*. As a result, qualified immunity does not bar Plaintiffs' claim for equitable relief under section 1983.

*Doran v. Mo. Dep't of Soc. Servs.*, No. 07-CV-04158-NKL, 2008 WL 111290 *1, *3-5 (Jan. 8, 2008, W.D. Mo.).

The same principles apply here. The individual Defendants are protected by qualified immunity, with respect to legal damages, to the extent that the alleged conduct occurred before February 9, 2005. Because Wilhoite's allegations concern events that took place well after that date, qualified immunity is not an issue in her case.

Defendants' related Eleventh Amendment arguments have already been considered in the Court's Order granting Wilhoite's motion to amend her Complaint in all respects relevant here. [Doc. # 73.]

### 4.    Injunctive Relief

Defendants also argue that Wilhoite is not entitled to injunctive relief under Count II of her First Amended Complaint. To issue an injunction, the Court "must determine that a cognizable danger of future violation exists and that danger must be more than a mere possibility." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982). Furthermore, "such relief is not appropriate where an adequate remedy under state law exists." *Sterling v Calvin*, 874 F.2d 571, 572 (8th Cir. 1989) (citation omitted).

Wilhoite responds: "While Defendant argues that it is unlikely that Plaintiff will ever be in a situation where the Department has paid her medical expenses and she is seeking damages against a liable third party, that possibility exists." [Doc. # 83 at 24.] With respect to Wilhoite, who has never made any payment to Defendants, this argument does not pass

muster because the possibility of future violation is too remote. Therefore, the Court grants Defendant's Motion for Summary Judgment with respect to Wilhoite's Count II as it relates to her individually.

### 5. Wilhoite's State Law Claims

#### a. Breach of Contract

Wilhoite's Count VII asserts a breach of contract claim against Defendant Levy in his official capacity. Wilhoite argues that DSS breached the obligation of good faith and fair dealing implicit in every contract. To support this breach of contract theory, Wilhoite points to no written document, but maintains that she entered into a contract with DSS when Defendant agreed to provide her with Medicaid benefits and she agreed to assign her rights to payment for medical care from a third party to Defendant. In response, Defendants argue that even assuming that there was such an offer and acceptance, there could still have been no contract due to a lack of consideration.

Under the preexisting duty rule, there is no consideration in a promise to do what the law already requires one to do. *See, e.g.*, *In re Wood's Estate*, 232 S.W. 671, 674 (Mo. 1921) (en banc). In the classic *Wood's Estate* case, a husband promised to provide financial support and maintenance for his wife in exchange for her promise never "to communicate with him, either by mail or telephone, to abstain from entering any residence, house, or place of business where he might be, and to refrain at all times from personally molesting, disturbing, or troubling him." *Id.* Because the Missouri Supreme Court found that the

husband had a preexisting legal obligation to provide for his wife, his promise to support her financially did not constitute consideration:

> No principle in the law of contracts is better established than that a promise to do what the promisor is required by law to do constitutes no consideration for the promise. If, therefore, Mrs. Wood, by her husband's promise, got no more than that to which she was entitled under the law, and presently, but not pertinent here, we will contend that she got less, there was lacking from the transaction that necessary essential to a valid contract, namely, a consideration.

*Id.*

Like the husband in *Wood's Estate*, DSS had a legal obligation to provide Medicaid benefits to Plaintiff upon her application and proof of eligibility. Chapter 208, RSMo; 42 U.S.C. § 1396a(a)(10). Likewise, state and federal law required Wilhoite to assign to Defendant her right to reimbursement from a liable third party. Mo. Rev. Stat. § 208.215.15; 42 U.S.C. § 1396a(a)(25)(H). Under the preexisting duty rule, Wilhoite's breach of contract theory fails for want of consideration.

### b.    Unjust Enrichment

Finally, Defendants also move for summary judgment with respect to Wilhoite's unjust enrichment claim against all Defendants. Defendants argue that they were not enriched by the receipt of any benefit from Wilhoite.

"The elements of unjust enrichment are: 'a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable.'" *Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96, 100 (Mo. App. Ct. 2009)

(quoting *Hertz Corp. v. Raks Hospitality, Inc.*, 196 S.W.3d 536, 543 (Mo. App. Ct. 2006)). Unjust enrichment claims arise out of contract law; they are based on a "legal fiction" that provides a means of recovery where parties do not have an express contract. *United States v. Applied Pharm. Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999) (applying Arkansas law).

As Defendants point out, Wilhoite never made any payment to Defendants. Indeed, Wilhoite's counsel had not even received the settlement money when this lawsuit was filed. Placing the amount equivalent to the asserted lien in her attorney's trust account under these circumstances does not constitute conferring a benefit on Defendants.

Moreover, Count VI of Plaintiff's First Amended Complaint concludes with the following prayer for relief: "WHEREFORE, Plaintiff prays this Court . . . enter judgment against Defendants compelling Defendants to disgorge all amounts collected in violation of 42 U.S.C. § 1396p(a)(1) . . . ." [Doc. # 75 at 16.] Because it is uncontroverted that there were no "amounts collected" in the case of Wilhoite, the Court grants Defendant's Motion for Summary Judgment with respect to Wilhoite's Count VI.

### III. Conclusion

Accordingly, it is hereby ORDERED that the Motion for Summary Judgment [Doc. # 78] filed by Defendants Missouri DSS, Ronald J. Levy, Ian McCaslin, Julie Creach, and Markus Cicka, is GRANTED with respect to Wilhoite's Count II, Count VI, Count VII, and the constitutional claims within Count I and Count IV; it is DENIED in all other respects.

The Motion to Intervene [Doc. # 80] filed by Wilhoite's counsel on behalf of René Dampier, Justin Epperson, Kelly Forest, Kensey Esry, K.E. by and through her next friend Kensey Esry, Shadow Dickerson, Kathleen Mitchell, Donna Collinge, Sandy Stidham, and Kathryne Harris is GRANTED. The Court vacates its order [Doc. # 73] ordering Wilhoite to pay Defendants' attorneys fees.


                                                    s/ Nanette K. Laughrey
                                                    NANETTE K. LAUGHREY
                                                    United States District Judge

Dated:  July 15, 2011
Jefferson City, Missouri