# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

RAMONA DENISE WILHOITE, )
individually and on behalf of others )
similarly situated, )
            )
          Plaintiff, )    Case No. 2:10-CV-03026-NKL
            )
    v. )
            )
MISSOURI DEPARTMENT OF SOCIAL )
SERVICES, by and through its director, )
Robert J. Levy, )
            )
          Defendant. )
            )
RENÉ DAMPIER, *et. al.*, )
            )
          Intervenors. )

## ORDER

Plaintiff Ramona Wilhoite, individually, and Intervenor Rene Dampier, along with the rest of the named Intervenors, claim that Defendant Missouri Department of Social Services ("DSS") has asserted liens against their private settlements that violate 42 U.S.C. Section 1396p(a)(1) ("the federal anti-lien statute") and the United States Constitution. Pending before the Court are Defendant DSS's motion for summary judgment [Doc. # 166] and Plaintiff Wilhoite's and the Intervenors' motion for summary judgment [Doc. # 168]. For the following reasons, the Court grants DSS's motion in part, and grants Wilhoite's and the Intervenors' motion in part.

## I.     Background

The Plaintiff in this case is Ramona Denise Wilhoite, individually and on behalf of others similarly situated, and the Intervenor Plaintiffs in this case are Rene Dampier; Justin Epperson; Donna Collinge; Shadow Dickerson; Kelly Forest; Kenley Esry; Kathleen Mitchell; Sandy Stidham, as next friend for B.C., the surviving minor child of Chastity Cook; Kathryne Harris; and K.E., through her next friend Kenley Esry.

Defendant Missouri Department of Social Services ("DSS") is the state agency that administers Medicaid benefits in Missouri. Individual Defendants Levy, Scott, Reeter, Renne, Sherman, Rackers, Ditmore, Rehagen, Muck, and Hart are all former DSS employees. Individual Defendants McCaslin, Creech, and Cicka currently work for DSS.

Wilhoite and all Intervenors settled personal injury claims with third-party tortfeasors. Neither Wilhoite's settlement, nor the settlements of any Intervenor, allocated the recovery into categories of damage. DSS has acknowledged that it became aware through this lawsuit that Wilhoite did not seek recovery for medical expenses in her third-party claim and that her settlement did not include recovery for medical expenses. [Doc. # 175 at 20]. It is undisputed that the amount of each of the Intervenors' settlements exceeded the amount DSS paid in medical costs on behalf of that Intervenor.[1]

After receiving notice of Wilhoite's and each of the Intervenor's lawsuits, DSS sent a letter to each individual that contained the following paragraph:

---

[1] DSS notes that it has only received unexecuted copies of the Intervenors' settlement agreements, but also notes that this does not create a genuine issue of fact because these documents speak for themselves. For the purpose of this Motion for Summary Judgment, the Court assumes, as does DSS, that the Intervenors executed these agreements.

2

> Section 208.215, RSMo (Cum. Supp. 1998) grants [DSS] a lien upon any funds to be paid as a result of any settlement or judgement obtained or made by the above-named Medicaid recipient. This letter, therefore, is your notice that [DSS] is asserting a lien against any settlement or judgement involving the above-named Medicaid recipient.

*E.g.*, [Doc. # 166-1 at 2].  Mo. Rev. Stat. Section 208.215.8 says, in relevant part: "The department of social services...shall have a lien upon any moneys to be paid...in settlement...on any claim for injuries...which resulted in medical expenses for which the department...made payment...."

Wilhoite placed into her attorney's trust account the amount asserted by DSS as the lien amount.  [Doc. # 90 at 4].  Dickerson and Mitchell took this same approach.  Each of the remaining Intervenors sent a check to DSS for the full lien amount claimed by DSS.

Wilhoite's Amended Complaint [Doc. # 75] alleges that DSS asserted a lien against her private settlement in excess of the portion of that settlement which compensated her medical costs.  Wilhoite alleges this is contrary to the Supreme Court's decision in *Ahlborn*. Count I of Wilhoite's Complaint proceeds under Section 1983 and alleges individual Defendants Levy, Creach, McCaslin, Scott, and Reeter, in their individual capacities, violated her rights under the federal anti-lien statute and her right to procedural due process under the Fourteenth and Fifth Amendments; Count II proceeds under Section 1983, alleges that all Defendants violated her rights under the federal anti-lien statute, and requests injunctive relief; Count III seeks attorney fees against all Defendants under Section 1988; Count IV seeks declaratory judgment that Mo. Rev. Stat § 208.215.8 and DSS's lien procedures violate the federal anti-lien statute and the United States Constitution; Count V

3

asserts a violation of the Takings Clause against all Defendants; Count VI alleges a claim for unjust enrichment against all Defendants; and Count VII alleges breach of contract against Levy in his official capacity. On July 15, 2011, the Court granted in part DSS's motion for summary judgment, dismissing Counts II, VI, and VII and the constitutional claims within Counts I and IV. [Doc. # 90 at 31].

The Intervenors' Amended Complaint [Doc. # 141] proceeds on the same basic theory as Wilhoite's Complaint, with the factual distinction that most Intervenors have actually paid money to DSS on the lien asserted against them, rather than holding that amount in trust as Wilhoite did. Intervenors' Count I proceeds under Section 1983 and alleges that Defendants Levy, Creach, McCaslin, Scott, and Reeter, in their individual capacities, violated Intervenors' rights under the federal anti-lien statute, procedural due process, and the Takings Clause; Count II proceeds under Section 1983 and alleges that all Defendants violated Intervenors' rights under the federal anti-lien statute and requests injunctive relief; Count III requests attorney fees from all Defendants under Section 1988; Count IV asks for declaratory judgment against all Defendants that Mo. Rev. Stat § 208.215.8 and DSS's lien procedures violate the federal anti-lien statute and the United States Constitution; Count V alleges that all Defendants violated the Takings Clause; and Count VI alleges that all Defendants were unjustly enriched. On October 3, 2011, the Court granted partial summary judgment for DSS, dismissing Counts II, VI, and the constitutional claims within Count I and IV as to Intervenors Dickerson and Mitchell. [Doc. # 134].

## II.   Discussion

**A.    Wilhoite's Individual Claim for Declaratory Judgment that the Missouri Statute Violates the Federal Anti-Lien Statute**

Wilhoite seeks declaratory judgment that Mo. Rev. Stat. § 208.215 is preempted by the federal anti-lien statute.  The Court has already denied summary judgment for DSS on this claim.  Wilhoite now moves for summary judgment.  Declaratory judgment is appropriate where there is an "actual controversy."  28 U.S.C. § 2201.  "The controversy requirement of the Declaratory Judgment Act is synonymous with that of Article III of the Constitution." *County of Mille Lacs v. Benjamin*, 361 F.3d 460, 463 (8th Cir. 2004), *cert. denied*, 543 U.S. 956.  Thus, in order to demonstrate standing in an action for declaratory judgment, a plaintiff must "demonstrate that he has suffered an injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Id.* (internal alterations omitted).

An actual controversy exists in Wilhoite's suit for declaratory judgment.  First, Wilhoite's case is substantially similar in this regard to the case in *Arkansas Dep't of Health and Human Servs. v. Ahlborn*, 547 U.S. 268 (2006).  There, the United States Supreme Court considered a Medicaid beneficiary's claim for declaratory judgment that Arkansas's Medicaid lien statute violated the federal anti-lien statute.  The parties stipulated that Arkansas had asserted a lien against the plaintiff that exceeded the portion of the Plaintiff's tort recovery meant to compensate for medical costs.  The Supreme Court reached the merits of the claim and held that "Arkansas' statute finds no support in the federal third-party liability provisions, and in fact squarely conflicts with the anti-lien provision of the federal

Medicaid laws." *Id*. at 280. The Supreme Court then specified that "Arkansas' third-party liability provisions are unenforceable insofar as they compel a different conclusion." *Id*. at 292. Although the Supreme Court did not specifically discuss the issue of standing, the Supreme Court reached the merits of the plaintiff's claim which suggests that the Supreme Court believed the plaintiff had standing to pursue the claim.

Defendants argue that Wilhoite lacks standing because Defendants now admit that Wilhoite's third party complaint did not contain a claim for medical expenses. Defendants fail to cite a case that says there is no case and controversy for purposes of standing when a defendant makes an admission after the lawsuit is filed. In fact, standing is determined at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Clearly, at the time the lawsuit was filed, DSS had asserted a lien against Wilhoite's settlement for all her medical expenses paid by DSS. While Wilhoite did not give DSS the funds, she was deprived of access to the funds because her lawyer could not give them to her until after the lien was voluntarily removed or found to be invalid. To this date, while Defendants admit her settlement does not cover medical expenses, it has not admitted a mistake or directly withdrawn its lien.

Turning to the merits, Wilhoite argues that the terms of the Missouri statute do not limit the amount of Missouri's statutory lien to the portion of Wilhoite's recovery that is compensation for medical damages, as required by the Supreme Court's interpretation of the federal anti-lien statute in *Ahlborn*. DSS argues that the "plain language" of the Missouri lien statute limits any lien by DSS to the appropriate amount. But the Court has already

6

addressed this issue of statutory interpretation, and concluded that "Missouri's statute...squarely conflicts with the anti-lien provision of the federal Medicaid laws." [Doc. # 90 at 19]. Although Wilhoite had not moved for summary judgment on the issue of declaratory judgment at that time, such a motion is now before the Court, and summary judgment for Wilhoite is appropriate.

DSS also argues that even if Missouri's lien statute violates federal law, it provides sufficient procedural protections such that the statutory scheme as a whole should not be found to violate federal law. This argument is unpersuasive. DSS argues that Wilhoite could have informally contested her lien amount by informing DSS – as part of her correspondence concerning the lien amount – that the portion of her settlement for medical costs was less than the medical costs expended by DSS on her behalf. But DSS has presented no evidence that it would have honored a request to limit a lien to the amount allocated in the settlement for medical expenses and the procedures implemented by DSS and their actions suggest otherwise.

DSS also argues that Wilhoite could have formally contested her lien amount by filing suit in state court under Mo. Rev. Stat. § 208.215.9. But these procedural protections are irrelevant to whether the Missouri statute is preempted under the reasoning of *Ahlborn* because the post-lien procedures contained by § 208.215.9 do not require DSS to limit the lien to the portion of a settlement for medical expenses. DSS "points to no provision of the [Missouri] statute that prevents it from" demanding the entirety of the costs it paid on the Medicaid recipient's behalf, *Ahlborn*, 547 U.S. at 279 n.8. The Court thus concludes,

7

similarly to the Supreme Court in *Ahlborn*, that Missouri's lien statute is preempted under these circumstances because it imposed a lien on a settlement that does not compensate for medical expenses paid by DSS. *Id.* at 292. There is no disputed fact issue bearing on this question, and Wilhoite, not DSS, is entitled to summary judgment against Robert Levy, the alleged Director of the Missouri Department of Social Services.[2]

**B.     Wilhoite's Individual Claim Under Section 1983 for a Declaration that DSS's Lien Procedure Violated Her Federal Statutory Rights Under the Anti-Lien Act**

**1.     Whether Wilhoite Can Show a Violation**

Wilhoite argues that DSS asserted a lien against her tort recovery in excess of that allowed by *Ahlborn*. In *Ahlborn*, the plaintiff's tort settlement did not distinguish what portion was payment for medical expenses, but the parties stipulated that amount to the reviewing federal court. Here, the parties agree on the amount of the lien DSS asserted against Wilhoite, and that Wilhoite's settlement "did not include recovery for medical expenses." [Doc. # 175 at 20]. The Court thus grants summary judgment for Wilhoite, and denies summary judgment for DSS, on whether DSS violated Wilhoite's rights under the federal anti-lien statute. Federal law precluded DSS from asserting *any* lien on Wilhoite under these circumstances, and the entire amount of DSS's lien is invalid.

**2.     Wilhoite's Relief**

_____

[2] If Mr. Levy is no longer the director, the parties are ordered to take whatever steps necessary to clarify the issue so that the Court's order can be amended to apply to the current director.

The Court has found that DSS's lien against Wilhoite was wrongfully imposed in violation of federal law. The Court therefore declares that DSS is entitled to no portion of the funds held in trust by Wilhoite's attorney. *See Ahlborn*, 397 F.3d at 628 (remanding with directions to enter judgment for the State in the amount of the lien that could properly be asserted under federal law).

Wilhoite is incorrect, however, to the extent she argues that she is entitled to any form of monetary relief against DSS or any other defendant in their official capacity. Such claims are clearly barred by the Eleventh Amendment, which "protects a state official sued in his official capacity from all claims except for certain forms of prospective equitable relief, such as reinstatement." *Hopkins v. Saunders*, 199 F.3d 968, 977 (8th Cir. 1999), *cert. denied*, 531 U.S. 873; *see also Tristani*, 609 F. Supp. 2d at 487 ("As the parties all appear to recognize, the Eleventh Amendment would bar an action against the [department] (or an official-capacity action against [an individual defendant]) seeking the return of the money in question regardless whether the requested relief is properly characterized as legal or equitable."), *grant of immunity aff'd*, 652 F.3d at 378 n.19. Wilhoite's primary case suggesting to the contrary is *McKesson Corp. v. Div. of Alc. Beverages and Tobacco*, 496 U.S. 18, 31 (1990), which Wilhoite claims endorses disgorgement as a remedy in cases against state governments. But that case made clear that it proceeded under the rule that "[t]he Eleventh Amendment does not constrain the appellate jurisdiction of the Supreme Court over cases arising from state courts." *Id*. The Supreme Court noted that the Eleventh Amendment continues to bar "original suit in federal court", such as this one. *Id*. at 30.

9

Wilhoite also relies on *Gilliard v. Craig*, 331 F. Supp. 587, 593 (W.D.N.C. 1971), which granted class representatives monthly restoration payments retroactive to the beginning of the government's illegal aid reductions. But that case was decided before the Supreme Court's opinion in *Edelman v. Jordan*, 415 U.S. 651, 668 (1974), which clarified that the Eleventh Amendment bars claims for retroactive relief that require payment from state treasuries, even where those claims are termed "equitable restitution." For this reason, Wilhoite's claims for disgorgement must be dismissed; these claims seek retroactive relief from Missouri's treasury.

Thus, Wilhoite is not entitled to interest, damages for pain and suffering, or punitive damages against DSS or any other defendant in their official capacity. Such claims would seek retroactive relief from Missouri's treasury, and Wilhoite has not argued that such relief is ancillary to the declaratory relief ordered in favor of Wilhoite. *See Hutto v. Finney*, 437 U.S. 678, 691 (1978).

But the Eleventh Amendment does not bar Wilhoite's claims against the defendants in their individual capacity, that is, claims for damages that would be paid out of a defendant's own pockets. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); ERWIN CHEMERINSKY, FEDERAL JURISDICTION 443 (5th ed. 2007).

Wilhoite first claims she is entitled to damages from the defendants in their individual capacity for pain and suffering. For this argument, Wilhoite cites *Nicks v. Missouri*, 67 F.3d 699, 702 (8th Cir. 1995), which affirmed damages for pain and suffering in a plaintiff's Section 1983 claim where the state-employee plaintiff had received worker's compensation

10

"for a permanent partial disability resulting from the emotional stress caused by [a state coworker's] harassment." But here, Wilhoite has presented no comparable evidence of pain and suffering as a result of any action by a defendant. As for her claim for lost interest, Wilhoite has not shown that she has lost any interest, particularly since the funds were being held in an attorney trust account and, presumably, interest was paid on that account. While nominal damages might be appropriate, it is unclear on the present record which defendant is responsible for the payment of nominal damages since the Court cannot identify which defendants worked for DSS at the time Wilhoite's lien was imposed and their relative responsibilities at that time. While Wilhoite asks for additional time to do discovery on this issue, the de minimus nature of nominal damages does not warrant additional discovery.

Wilhoite also seeks summary judgment on her request for punitive damages, but Wilhoite never pleaded punitive damages. She claims her general catchall tag to her complaint raised a claim for punitive damages, but such generic language was not sufficient to put Defendants on notice of a claim for punitive damages under these circumstances. Further, because the evidence needed to allege a claim for punitive damages was known at the beginning of this lawsuit, there is no excuse for not including the request in the original complaint. Finally, Wilhoite has had sufficient time to amend her pleading or otherwise raise the issue but has failed to do so. It is now too late. Any claim by Wilhoite for punitive damages is dismissed.

11

However, Wilhoite is entitled to her reasonable attorney fees under 42 U.S.C. § 1988(6), which were ancillary to Wilhoite's request for a declaratory judgment that Missouri law and DSS procedures violated federal law. *See Missouri v. Agyei,* 491 U.S. 274 (1989).

## C. Intervenors' Claim Under Section 1983 that DSS's Lien Procedure Violated the Intervenors' Federal Statutory Rights Under the Anti-Lien Act

Intervenors claim that DSS violated the Anti-Lien Act by asserting liens against them in excess of that allowed by *Ahlborn*, and request summary judgment on this claim. DSS also seeks summary judgment. While the parties agree on the amount of the lien imposed by DSS on each Intervenor, they have not stipulated what amount of any Intervenor's settlement was meant to compensate that Intervenor for medical costs. Thus, the question is whether either party has presented sufficient evidence that as a matter of law they are entitled to summary judgment on this claim.

### 1. Burden of Proof

As a preliminary matter, neither party has expressly addressed who has the burden of proof to show either the validity of the liens or the invalidity of the liens. However, that issue need not be resolved at this time because regardless of where the burden of proof lies, there is a disputed issue of fact precluding summary judgment on this record.

### 2. Disputed Issues of Facts

Intervenors argue that because the Intervenors' settlement agreements disclaim all liability for medical payments, DSS was precluded by *Ahlborn* from subjecting *any* portion of the Intervenors' recovery to a statutory lien. [Doc. # 176 at 28]. But the Eighth Circuit

12

in *Ahlborn* left open the possibility that a state could recover a portion of a Medicaid recipient's tort settlement "not technically denominated payments for medical care and services" if "the third-party payment is properly recharacterized *as a payment for medical expenses*, despite a different label applied by the parties." *Ahlborn*, 397 F.3d at 627 (emphasis in original). In affirming the Eighth Circuit, the Supreme Court noted that "the risk that parties to a tort suit will allocate away the State's interest can be avoided...by submitting the matter to a court for decision." *Ahlborn*, 547 U.S. at 288. *Ahlborn* thus makes clear that neither a state nor a court is bound by the language in a settlement agreement that disclaims liability for medical payments.

A reasonable factfinder could find, after considering all the evidence, that the Intervenors were compensated by their settlements for the full amount of their medical expenses. The following facts could support such a finding.

DSS first points out that most Intervenors did not dispute the amount of medical costs submitted to them by DSS prior to this lawsuit and did not argue before paying the lien that this amount should be reduced due to the allocation of their settlement. DSS also claims that at least three of the Intervenors pleaded medical expenses as damages in their state court petition before entering settlements. [Doc. # 166-3 at 34]. DSS claims that some Intervenors requested pro rata attorney fees for the entire amount of the lien claimed by DSS, and argues: "If Intervenors' third-party settlements did not include a recovery for medical expenses paid by [DSS], then it would be improper for their attorney to request [DSS] to pay a share of their attorney's fees for the recovery in question." [Doc. # 166 at 32]. DSS also claims that

13

Intervenors Dickerson, Mitchell, Forest, Esry, and K.E. all agreed in their settlement releases to indemnify their tortfeasors for the full amount of their medical costs in any suit against their tortfeasors by DSS. [Doc. # 166 at 30].[3]

On the current record, DSS is also not entitled to summary judgment on this claim. At best, there is evidence that the Intervenors' settlements included some compensation for medical costs. But a reasonable juror, after considering the undisputed facts of the record, could still conclude that the Intervenors' settlements did not compensate them for the full amount of their medical costs, and that DSS's lien for the full amount of medical costs was improper under *Ahlborn*. It is undisputed that all of the Intervenors entered settlements that denied liability and that did not allocate damages. Such a settlement is especially suggestive of a compromise between the parties that does not fully compensate the plaintiff for his or her total damages from the alleged tort claim. It is unlikely that any such settlement fully compensated the Intervenors for any particular category of damage, and this includes medical costs. While it is statistically likely that most Intervenors did not recover for all of their medical expenses, it is impossible to decide the issue without weighing the evidence in the context of each case.

### 3. DSS's Defenses

---

[3] Intervenors admit that the releases executed by Intervenors Cook, Dickerson, and Mitchell contain such indemnification clauses. [Doc. # 176 at 30]. Intervenors appear to refute that Intervenors Forest, Esry, and K.E. agreed to indemnification. Because the Court does not find this evidence dispositive, the Court need not consider at this time whether to resolve this potential factual dispute.

14

DSS also argues that all the Intervenors' statutory claims, even if established, are barred by several defenses. Specifically, DSS claims that because the Intervenors failed to notify DSS during their informal communications that DSS's liens violated *Ahlborn*, they should be equitably estopped from raising the issue now. But even the case cited by DSS demonstrates that DSS must show that it was prejudiced by the delay. *Grannemann v. Columbia Ins. Group*, 931 S.W.2d 502, 506 (Mo. Ct. App. 1996). DSS has not argued, or presented evidence, that allowing the Intervenors' statutory argument now will cause DSS prejudice. Thus, the Court rejects this argument. Further, Intervenors' earlier silence is not inconsistent with their current claims unless it can be shown that they knew about *Ahlborn* at the time they paid DSS. DSS has presented no such evidence. Nor did DSS take any action based on Intervenors' silence.

DSS also claims that the Intervenors' failure to contest the liens on *Ahlborn* grounds through formal or informal procedures waived their right to do so in this lawsuit. "A waiver is an intentional relinquishment of a known right." *Austin v. Pickett*, 87 S.W.3d 343, 348 (Mo. Ct. App. 2002). "To rise to the level of waiver, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." *Id.* The Intervenors argue that their actions cannot constitute waiver because they were involuntary. Specifically, the Intervenors argue that their actions were coerced by the threat of delay and expense of extra litigation, by the inequality of bargaining power between the Intervenors and DSS, and because of the Intervenors' lower economic status. *See Evans v. City of Chicago*, 522 F. Supp. 789, 795

15

(N.D. Ill. 1980). The Court agrees that the Intervenors did not voluntarily waive their right to argue that DSS's procedure violated *Ahlborn*, where DSS's lien notices expressed DSS's belief that it could recoup its entire medical costs from the Intervenors' settlement and where Missouri's procedure for judicial review did not appear to allow a court to reduce a lien to comply with *Ahlborn*.[4]

DSS argues that the Intervenors' failure to contest their lien amount until filing this lawsuit entitles DSS to the equitable defense of laches. "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Hubbard Feeds, Inc. v. Animal Feed Supplement*, 182 F.3d 598, 602 (8th Cir. 1999). Assuming the defense of laches is available to this type of claim, the Court rejects DSS's argument because DSS has failed to show undue prejudice. DSS merely argues that it was unduly prejudiced by the Intervenors' delay because during that period the class of individuals subject to Section 208.215 has continued to grow, exposing DSS to greater and greater potential liability. To the extent that DSS implies that the Intervenors should have instructed DSS on the effect of the *Ahlborn* decision, DSS's argument is not persuasive because DSS has not presented evidence that it was unaware of *Ahlborn*'s holding or explained why the responsibility for this ignorance should not fall on DSS – the agency charged with enforcing the relevant statute. In fact, the Intervenors have

---

[4] While it is true that § 208.215 does permit a judge to consider equity when reducing a lien, DSS does not explain why compliance with federal law is a matter of equity. And, more importantly, why it was the responsibility of the Intervenors to make the argument.

Case 2:10-cv-03026-NKL   Document 182   Filed 08/27/12   Page 16 of 31

presented evidence through Defendant Reeter's deposition that DSS was aware of the effects of *Ahlborn*. Further, the Defendants do not explain how the Intervenors' use of DSS procedures would have alerted DSS that future potential class members were the subject of invalid liens. More importantly, DSS has continued to assert that its lien letter comports with *Ahlborn* so there is no evidence they would have done anything differently.

Finally, DSS argues that because Intervenors Dickerson and Mitchell never paid money to DSS, that DSS could not have violated *Ahlborn* with regard to these Intervenors. But as the Court has previously held, it is the imposition of the lien at an amount greater than that allowed in *Ahlborn*, and not merely the payment of that lien amount, that violates the anti-lien statute as interpreted in *Ahlborn*. [Doc. # 90 at 21]. DSS's defenses all fail.

### 4. Intervenors' Damages

Because there is a disputed issue of fact concerning Defendants' liability to Intervenors, the Court need not address the issue of damages. However, the Court's order concerning Wilhoite should be instructive. Further, because neither party is entitled to summary judgment on the issue of liability, the Court grants Intervenors' request to conduct additional discovery to develop the record as to which Defendant may be responsible for damages in their individual capacity. Because some Intervenors are seeking money wrongfully paid to the Defendants, it would be hyper-proceduralistic to prevent them from gathering this evidence, given the apparent confusion over those Defendants' depositions.

One further matter requires clarification. In its current briefing, DSS has not argued that the individual Defendants are entitled to qualified immunity on the Intervenors' damage

17

claims. DSS may have viewed such an argument foreclosed by the Court's previous ruling denying summary judgment to DSS on its qualified immunity defense against Wilhoite. [Doc. #90 at 26-28]. However, upon further consideration, the Court has concluded that qualified immunity is not precluded merely because the Plaintiffs are seeking restitution of money wrongfully withheld by the State of Missouri. As previously indicated, such a claim cannot be made against the State and no individual defendant holds the money which the State is alleged to have wrongfully taken. Therefore, the Court will permit any Defendant to raise a qualified immunity defense, no later than 30 days after all discovery of the individual Defendants is completed. The court does not mean to suggest that such a defense is or is not available, but merely believes its earlier ruling concerning restitution may have misled the Defendants.

### D. Intervenors' Constitutional Claims

The Court has already granted summary judgment for DSS and dismissed the Fifth Amendment takings claims and claims that DSS violated the procedural due process rights of Wilhoite [Doc. # 90] and of Intervenors Dickerson and Mitchell [Doc. # 134]. Remaining are the claims of Intervenors Dampier, Epperson, Collinge, Forest, Esry, Stidham, Harris, and K.E. that DSS violated their procedural due process rights and effected a taking in violation of the Fifth Amendment. Both Intervenors and DSS have moved for summary judgment on these issues.

### 1. Procedural Due Process

18

The Intervenors first argue that the entirety of Mo. Rev. Stat. § 208.215 is preempted by federal law, including the "portions of that statute that purport to grant judicial authority to review the enforcement and apportionment of a lien." [Doc. # 169 at 42-43]. The Intervenors effectively argue that the statute provides no legitimate procedure and thus violates the Due Process Clause. The Court has already held, however, that the Missouri statute is not preempted in its entirety but is only preempted to the extent that it conflicts with *Ahlborn*. *See Ahlborn*, 397 F.3d at 628 (8th Cir. 2005), *aff'd*, 547 U.S. 268.

DSS also suggests that the Court has already decided this issue because it noted that "§ 208.215 and the Department's procedures include informal and formal methods for recipients to contest or establish or reduce the Department's reimbursement amount ...." [Doc. # 175 at 40]. But on the same page of that order the Court stated that Wilhoite had not called into question those procedures. In this motion, the Intervenors have called those procedures into question.

Before addressing the merits of the Intervenors' claim, the Court must address whether the Intervenors have standing to assert a procedural due process claim given that the Court finds a genuine issue of material fact exists as to whether DSS asserted a lien against the Intervenors in excess of that allowed by *Ahlborn*. This question is resolved by *Carey v. Piphus*, 435 U.S. 247, 251 (1978), where two students were each suspended for twenty days without any procedural due process, but would have been unsuccessful even if a pre-suspension process was available. The United States Supreme Court explained that the right to procedural due process is "'absolute' in the sense that it does not depend upon the merits

19

of a claimant's substantive assertions" and that for this reason, "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266. Even if all of DSS's liens against the Intervenors are found at trial to have complied with *Ahlborn*, this would not interfere with the Intervenors' right to pursue a claim for nominal damages if DSS denied them the absolute right of procedural due process. Thus, the merits of Intervenors' claim must be addressed.

The Intervenors argue that they were entitled to a pre-deprivation hearing before DSS asserted liens against them and that DSS provided no such hearing. DSS argues that the Intervenors' claim should be dismissed because Intervenors failed to seek lien reduction through a lawsuit under § 208.215 or through informal negotiations.

"To state a procedural due process violation, [a plaintiff] must first demonstrate the deprivation of a protected liberty or property interest." *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009). "Without doubt, state procedures for creating and enforcing attachments, as with liens, are subject to the strictures of due process." *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991). The Court has found that DSS has asserted a lien against the private settlement of the Intervenors; this constitutes the deprivation of a protected property interest. *Accord Tristani v. Richman*, 609 F. Supp.2d 423, 480 (W.D. Pa. 2009), *aff'd in part, vacated in part*, 652 F.3d 360 (issue not raised on appeal).

The Court must next determine the amount of process due Intervenors. "Generally, where deprivations of property are authorized by an established state procedure...due process is held to require predeprivation notice and hearing in order to serve as a check on the

possibility that a wrongful deprivation would occur." *Keating v. Nebraska Public Power Dist.*, 562 F.3d 923, 928 (8th Cir. 2009) (internal quotes and alterations omitted). The Supreme Court has recognized "two notable exceptions" to this rule: (1) "where there is a need for quick action by the State when there is a compelling or overriding interest in a summary adjudication"; and (2) "where the deprivation results from a random and unauthorized act by a state actor." *Id.* Where the Supreme Court has excused a pre-deprivation hearing because of the need for quick action, it "has emphasized the availability of a prompt post-deprivation administrative hearing to challenge the governmental action in finding that due process was satisfied." *Moore v. Warwick Pub. Sch. Dist. No. 29*, 794 F.2d 322, 327 (8th Cir. 1986).

In *Connecticut v. Doehr*, 501 U.S. 1 (1991), the U.S. Supreme Court addressed an issue similar to the one in this case. In that case it evaluated whether a Connecticut statutory scheme which allowed a private party to obtain an *ex parte*, prejudgment attachment of another party's property without any showing of exigency was a violation of due process. The Supreme Court first rejected the argument that the attachment was not subject to due process because it was a temporary or partial impairment to property, rather than a permanent deprivation. *Id.* at 12. It then identified what must be weighed to determine what process is due.

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and lastly [3] the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement
would entail.

*Id*. at 10 (internal quotes omitted). *Also see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Addressing the first factor, the Intervenors argue that DSS's liens encumbered their
settlement and prevented them access to their money. This is significant because Intervenors
could not have qualified for Medicaid unless they were indigent. However, while the
Intervenors' settlements were subject to DSS's lien, the record reflects that the Intervenors
had an opportunity to bring suit in state court under § 208.215(9) to challenge the lien,
pursuant to which a state judge "may determine what portion of the recovery shall be paid
to [DSS] against the recovery". In making this decision, the state judge "shall consider
competent evidence pertaining to the following matters:"

> (1) The amount of the charge sought to be enforced against the recovery when
> expressed as a percentage of the gross amount of the recovery; the amount of
> the charge sought to be enforced against the recovery when expressed as a
> percentage of the amount obtained by subtracting from the gross amount of the
> recovery the total attorney's fees and other costs incurred by the participant
> incident to the recovery; and whether the department should, as a matter of
> fairness and equity, bear its proportionate share of the fees and costs incurred
> to generate the recovery from which the charge is sought to be satisfied;

> (2) The amount, if any, of the attorney's fees and other costs incurred by the
> participant incident to the recovery and paid by the participant up to the time
> of recovery, and the amount of such fees and costs remaining unpaid at the
> time of recovery;

> (3) The total hospital, doctor and other medical expenses incurred for care and
> treatment of the injury to the date of recovery therefor, the portion of such
> expenses theretofore paid by the participant, by insurance provided by the
> participant, and by the department, and the amount of such previously incurred
> expenses which remain unpaid at the time of recovery and by whom such
> incurred, unpaid expenses are to be paid;

22

(4) Whether the recovery represents less than substantially full recompense for the injury and the hospital, doctor and other medical expenses incurred to the date of recovery for the care and treatment of the injury, so that reduction of the charge sought to be enforced against the recovery would not likely result in a double recovery or unjust enrichment to the participant;

(5) The age of the participant and of persons dependent for support upon the participant, the nature and permanency of the participant's injuries as they affect not only the future employability and education of the participant but also the reasonably necessary and foreseeable future material, maintenance, medical rehabilitative and training needs of the participant, the cost of such reasonably necessary and foreseeable future needs, and the resources available to meet such needs and pay such costs;

(6) The realistic ability of the participant to repay in whole or in part the charge sought to be enforced against the recovery when judged in light of the factors enumerated above.

RSMo § 208.215(9). Further, pursuant to RSMo § 208.215(11), the state court can "reduce and apportion" DSS's lien amount "proportionate to the recovery of the claimant" and "may consider the nature and extent of the injury, economic and noneconomic loss, settlement offers, comparative negligence as it applies to the case at hand, hospital costs, physician costs, and all other appropriate costs."

The Intervenors argue that such a lawsuit is not adequate to protect their due process rights because the statute only permits the judge to consider a list of factors that does not include the limitation imposed by the *Ahlborn* court. The Court disagrees and finds that § 208.215 is adequate to protect the Intervenors' due process rights.

Even if the statute does not expressly authorize the state judge to reduce the lien to reflect the Intervenors' federal rights under *Ahlborn*, it does provide a forum to raise *Ahlborn*. And even if a state judge found that the statute did not permit the lien to be reduced

23

to comply with *Ahlborn*, the Intervenors would have a right to challenge the statute as a violation of the supremacy clause of the U.S. Constitution. Further, any adverse ruling could be appealed. Due process guarantees a right to a hearing, not a right to a correct decision. The fact that the statute did not notify the Intervenors that federal law provided them more rights than the statute listed, doesn't mean they were not provided notice. They got notice of the lien and notice of a forum in which they could challenge the lien. While it is understandable that Intervenors would not know about *Ahlborn*, there is nothing in the due process clause that requires a state to tell a litigant of possible challenges they can make.

Turning to the second factor, the Intervenors argue that the risk of erroneous deprivation is high because DSS automatically asserts a lien for the full amount of medical costs it paid on behalf of Medicaid beneficiaries, and asserts without explanation that additional safeguards would be "relatively easy to impose." [Doc. # 169 at 49].

The Intervenors' argument is not persuasive. Intervenors have not shown that if there had been a pre-lien hearing, that DSS would have used a different standard for determining the lien or that Intervenors would have a better opportunity to raise *Ahlborn*. Therefore, there is no evidence that the risk of erroneous deprivation would be affected by the timing of the hearing to challenge the lien.

Finally, the Court finds that DSS's interest in asserting a lien without a pre-deprivation hearing is substantial. The U.S. Supreme Court in *Doehr* found that the private plaintiff's interest in ensuring the availability of assets to satisfy the judgment was "*de minimis*" where he failed to allege that the defendant "was about to transfer or encumber his

24

real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment." *Id*. The *Doehr* court also found that "the State cannot seriously plead additional financial or administrative burdens involving predeprivation hearings when it already claims to provide an immediate post-deprivation hearing." *Id*. The Intervenors claim, without explanation, that DSS "would not undergo significant burden" in establishing additional procedures. [Doc. # 169 at 49].

Here, although DSS has not made an allegation that any of the Intervenors are at risk for transferring or encumbering their settlement amounts, such a finding, as to the class of Medicaid beneficiaries in general, is implied by Congress's decision to pass a law requiring states that participate in Medicaid to "have acquired the rights" of Medicaid beneficiaries to payments for medical costs, 42 U.S.C. § 1396a(a)(25)(H), and by federal courts finding this law to be a valid exception to the federal anti-lien act to the extent it complies with *Ahlborn*. *Tristani v. Richman*, 652 F.3d 360, 375 (3rd Cir. 2011). And although there is nothing in the record to suggest that a pre-deprivation hearing would cost Missouri more than the post-deprivation hearing it already offers, such a hearing runs the risk of wasting state funds since there is no guarantee at the time of such a hearing that the beneficiary would have the information needed to seek a reduction of the lien on *Ahlborn* grounds. Until there is a settlement, there is no basis for arguing what the exact amount of the loan should be, but if DSS waits to hold a hearing and impose a lien only after the beneficiary has entered her settlement, as would be required to ensure that DSS did not waste state funds by initiating a hearing before full information was available, then DSS would have frustrated federal

25

Medicaid law by providing the beneficiary a window in which to transfer or encumber her settlement before the state could recoup its authorized share.

Considering all factors in *Mathews*, the Court finds that a pre-lien hearing was not required.

### 2.    Intervenors' Takings Clause Claim

Intervenors claim that DSS's liens on the Intervenors' settlements constitutes a taking of private property for public use without just compensation, as prohibited by the Fifth Amendment to the U.S. Constitution. Both Intervenors and DSS seek summary judgment on this claim. Intervenors rely heavily on the Supreme Court's decision in *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164-65 (1980), which held that under the "narrow circumstances" of that case Florida violated the Takings Clause by retaining the interest earned on interpleader accounts deposited in the state court's registry. In discussing that case, Intervenors admit that while the services provided by the clerk of court "could have constituted just compensation for taking the interest," such an argument was precluded because the Supreme Court found that the clerk of court collected a separate fee for that purpose. [Doc. # 169 at 40]. Here, DSS argues that DSS's services in paying for the Intervenors' medical expenses constituted just compensation for DSS's liens on the Intervenors' settlements, citing *Mulk v. Ohio Dep't of Job & Family Servs.*, 2011 WL 5507093 at *7 (Ohio Ct. App. 2011) ("Further, appellants did receive compensation in the form of the initial payment of their medical expenses.").

Case 2:10-cv-03026-NKL   Document 182   Filed 08/27/12   Page 26 of 31

Intervenors do not point to any separate fee collected by DSS. Rather, Intervenors argue that "there is no evidence that the monies Intervenors recovered were related in any way to the medical services they received." [Doc. # 169 at 41]. That is correct and for that reason summary judgment must be denied because there is a disputed issue of fact whether the Defendants did take more of Intervenors' property than was permitted by law. If they did not, then there is no taking without just compensation.

DSS's Motion for Summary Judgment must also be denied because paying the Intervenors' medical expenses does not mean that DSS can recover Intervenors' settlement for pain and suffering claim or permanent disability, even though Missouri paid for the Intervenors' medical treatment. While some common law rules might permit such an argument, federal law specifically prohibits the application of those common law principles. So the fact that Missouri provided free medical care does not give them the right to take all of the Medicaid recipient's settlement, unless permitted by federal law.

### E. Intervenors' Claim for Declaratory Judgment that the Missouri Statute Violates the Federal Anti-Lien Statute

The Intervenors also ask for declaratory judgment that the Missouri statute and DSS's lien procedures violate the federal anti-lien statute and the U.S. Constitution, and DSS moves for summary judgment on the same. But the Court has found that it cannot determine on this record whether DSS asserted a lien on any Intervenor in excess of that allowed under *Ahlborn*. Thus, a genuine issue of material fact exists as to whether *Ahlborn* was violated

Case 2:10-cv-03026-NKL   Document 182   Filed 08/27/12   Page 27 of 31

with regard to the Intervenors, and the Intervenors are not entitled to summary judgment on this claim.

DSS also argues that declaratory judgment on the Intervenors' statutory claims would be improper because no case or controversy exists as to those claims. Intervernors Mitchell and Dickerson have not yet paid any money to DSS, so the same controversy discussed in Wilhoite's case also exists in their cases. As to the remaining Intervenors, DSS points out that these Intervenors paid money to DSS years ago, and argues that their case is thus moot because it "could not have any practical effect on the parties." *Citing Perez v. Sec'y of Health, Educ. & Welfare*, 354 F. Supp. 1342, 1345 (D. Puerto Rico 1972). This argument is not persuasive. In *Perez,* the plaintiff sought declaratory judgment that he should not have been denied disability benefits without a hearing. The court dismissed the action as moot after plaintiff was granted a full hearing, noting that the "plaintiff was given a hearing on this cause and there is nothing the defendant could do but what it has already done." *Id*. at 1346. Here, the Intervenors allege that DSS asserted a lien against them in violation of federal law and ask for declaratory judgment that the Missouri statute and DSS's procedures violate federal law. DSS has not claimed that it has returned to the Intervenors the money they paid under these liens. Thus, the reasoning of *Perez* does not apply and DSS is not entitled to summary judgment on these claims.

### F.    Intervenors'  Claim for Injunctive Relief

The Court has already granted summary judgment against Wilhoite's claim for injunctive relief, holding that the possibility of future violation is too remote.  [Doc. # 90 at

29].  In order to issue an injunction, "[t]he court must determine that a cognizable danger of future violation exists and that danger must be more than a mere possibility."  *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).  Although some Intervenors actually paid money to DSS to satisfy DSS's liens, and differ in this regard from Wilhoite's position, the Intervenors have not explained how this difference renders any less remote the possibility of future violation.  This case is easily distinguished from the cases relied on by Intervenors, all of which deal with the conditions of families' ongoing monthly payments under Aid to Families with Dependent Children grants.  *See Percey v. Blum*, 524 F. Supp. 324, 326 (N.D. N.Y. 1981); *Doe v. Swank*, 332 F. Supp. 61, 62 (N.D. Ill. 1971); *Gilliard v. Craig*, 331 F. Supp. 587, 589 (W.D.N.C. 1971).  In contrast, this case deals with DSS's one-time imposition of a lien on the Intervenors, who could not find themselves in the same position again unless they both had an accident that incurred medical costs and continued to qualify for Medicaid.  The Intervenors have provided no evidence as to the likelihood of this occurring, and the possibility of such an occurrence is intuitively remote.  The Court thus grants summary judgment for DSS on Intervenors' claims for injunctive relief.

G.     **Retroactivity**

Wilhoite and Intervenors argue that because they have asked the Court to apply settled principles of law announced by *Ahlborn*, the Court's decision should be applied retroactively to the date of the *Ahlborn* decision, citing *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 538-44 (1991).  Wilhoite and Intervenors do not explain how such a holding would relate to Wilhoite's and Intervenors' Complaints or what effect such a holding would have

29

on the case. The case on which Wilhoite and Intervenors rely also explains that "retroactivity must be limited by the need for finality," which includes res judicata and statutes of limitation or repose. *Id*. at 541. Without providing more facts about the possible impact of this requested ruling, Wilhoite and Intervenors have not established that they are entitled to summary judgment on this issue at this time and the Court dismisses the claim without prejudice.

## III. Conclusion

Accordingly, it is hereby ORDERED that the Defendant's motion for summary judgment [Doc. # 166] is GRANTED with regard to all remaining claims of injunctive relief, all claims for monetary relief against DSS or individual Defendants in their official capacities, including punitive damages, and Intervenors' procedural due process claims, and DENIED in all other regards. Plaintiff's claims in Plaintiff's motion for summary judgment [Doc. # 168] are GRANTED with regard to declaratory judgment on the statutory claims in Counts I and IV and attorney fees on the same, and DENIED in all other regards. Intervenors' claims in Plaintiff's motion for summary judgment are DENIED. Intervenors' request to conduct additional discovery as to which Defendant may be responsible for damages in their individual capacity is GRANTED. Any Defendant will be permitted to raise a qualified immunity defense no later than 30 days after all discovery of the individual Defendants is completed.

The Court hereby DECLARES, with regard to Plaintiff Wilhoite, that Mo. Rev Stat. § 208.215.8 violates 42 U.S.C. § 1396, *et seq.*, and that DSS's lien procedures violate 42 U.S.C. § 1396, *et seq*.


        s/ Nanette K. Laughrey
        NANETTE K. LAUGHREY
        United States District Judge

Dated: August 27, 2012
Jefferson City, Missouri